UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MEDLINE INDUSTRIES, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 17 C 7216 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| C.R. BARD, INC., | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Medline Industries, Inc. ("Medline") alleges that Defendant C.R. Bard, Inc., ("Bard") has infringed on Medline's patents for a medical tray and a patient information insert called a patient aid. The parties now seek construction of various terms in the claims of the subject patents, U.S. Patent Nos. 9,808,596 (the "'596 Patent"), 9,745,088 (the "'088 Patent"), 9,795,761 (the "'761 patent"), and 8,388,501 B2 (the "'501 patent"). The construction of the disputed claims and the Court's analysis follows.

**LEGAL STANDARD**

"Judicial 'construction' of patent claims aims to state the boundaries of the patented subject matter, not to change that which was invented." *Fenner Investments, Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015). Not all claims require construction, only those in dispute and only to the extent necessary to resolve the dispute. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Claims construction analysis begins with the intrinsic evidence, which "includ[es] the claims themselves, the specification, and the prosecution history of the patent." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013) (citations

omitted). The Court first reviews the language of the claims themselves, applying a "heavy presumption that claim terms take on their ordinary meaning as viewed by one of ordinary skill in the art." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) (citations omitted) (quotation marks omitted). The presumption of ordinary meaning prevails in all but two situations: (1) "when a patentee acts as his own lexicographer" or (2) "when the patentee disavows the full scope of the claim term in the specification or during prosecution." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (citations omitted).

If analysis of the intrinsic record resolves the ambiguity of a disputed term, "it is improper to rely on extrinsic evidence," which includes dictionary definitions, expert testimony, and other "evidence that is external to the patent and file history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583–84 (Fed. Cir. 1996). The Court may consider extrinsic evidence to ensure that the Court's construction of a claim "is not inconsistent with clearly expressed, plainly apposite and widely held understandings in the pertinent technical field." *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1346 (Fed. Cir. 2003). But it "may not be used to vary or contradict the claim language or the import of other parts of the specification." *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1358 (Fed. Cir. 2003) (citation and quotations omitted).

While claims must be construed in light of the specification, limitations from the preferred embodiments or specific examples in the specification typically cannot be read into the claims. *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998) ("This court has repeatedly stated that while claims are to be construed in light of the specification, they are not necessarily limited by the specification.") (citing *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277 (Fed. Cir. 1995)). Thus, while the specification may be used to aid in the

interpretation of the claims, it may not be used as a source for adding extraneous limitations.

*Rexnord Corp.* v. *Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)

## ANALYSIS

### A. "Patient Aid" in '761 Claims 1, 10, 15, and 19

The first disputed claim is the term "Patient Aid" as used in the '761 Patent Claims 1, 10, 15, and 19. The relevant portions of the disputed claims are as follows:

> **Claim 1**: "A tray configured to accommodate a Foley catheter, the tray comprising . . . further comprising a patient aid comprising post-procedure information, disposed on a first portion of the patient aid, for caring for the Foley catheter when applied to a patient."
>
> **Claim 10**: "A Foley catheter container, comprising: . . . further comprising a patient aid comprising post-procedure information, disposed on a first portion of the patient aid, for caring for the Foley catheter applied to a patient."
>
> **Claim 15**: "A tray for a Foley catheter, comprising: . . . further comprising information, disposed on a first portion of a patient aid, for caring for the Foley catheter when applied to a patient."
>
> **Claim 19**: "A single-layer tray, comprising: . . . further comprising post-procedure information for caring for the Foley catheter when applied to a patient, wherein the post procedure information is disposed on a first portion of a patient aid."

Bard argues that the appropriate construction of this term is "patient instructions configured with an appearance or indicia that ensures information is delivered to a patient undergoing a procedure, such as patient instructions that are configured with a greeting card appearance, activity sheet appearance, or other graphical indicia that indicates that the patient aid is intended for the patient." Bard argues that patient aid has no ordinary and customary meaning and that the Court must look to the specification to determine the meaning of "patient aid."

Medline counters that "patient aid" does not require construction and that its plain meaning suffices. According to Medline, "patient aid" is comprised of two non-technical words easily understood by a lay person. Medline argues that taken in context of the claims and specification, "patient aid" is clear. Medline also argues that Bard's proposed construction is confusing, redundant, and unnecessary and it impermissibly limits the scope of the claims to the specific examples in the specification.

Claim construction begins with the inquiry into how a person of ordinary skill in the art ("POSITA") understands a claim term. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Courts suppose that a POSITA reads the term in context of the claim itself as well as the entire patent, including the specification. *Id.* The four claims at issue clearly state that the patient aid in this case is something designed to convey information for caring for the Foley catheter after a practitioner has placed it inside the patient. Viewed in light of the specification, the patient aid clearly is some sort of document or other means of conveying this information. Bard's proposed construction is in line with this, with the exception that it attempts to import additional limitations from the specification to define the patient aid as taking the form of patient instructions with a specified appearance and structure. While it is proper to rely upon the specification to determine the meaning of disputed claims, it is not proper, outside of specified circumstances, to import limitations from the specification to the claim terms. *Enercon GmbH*, 151 F.3d at 1384 (claims are construed in light of, but not necessarily limited by the specification); *see also Transmatic*, 53 F.3d at 1277 ("[A] patent claim is not necessarily limited to a preferred embodiment disclosed in the patent."). Thus, the use of a greeting card or other type of patient aid may be a preferred embodiment in the specification, but the claims do not require it.

However, Bard also argues that the proper construction of patient aid requires clarification that the patient aid include some indication that it is intended to be given directly to the patient. In support of this argument, Bard cites to *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1317 (Fed. Cir. 2014), which held that where a claimed invention is designed to address a specific problem, it is proper to import requirements from the specification that serve that purpose. The specification of the '761 patent makes it abundantly clear that even when manufacturers provide patient information in their device kits, health care providers have trouble differentiating between information the health care provider should keep and information that they should give directly to the patient. The '761 patent proposes as a solution for this problem a patient aid configured with some appearance that plainly indicates it is intended for the patient. This appears to be a key improvement over the prior art and thus an essential element of the meaning of a patient aid in the '761 patent. Thus, the proper construction of patient aid is "patient instructions configured with an appearance or indicia that ensures information is delivered to a patient undergoing a procedure."

B.     **"Use" in '088 Claims 1, 25, 37; '761 Claim 1; and '596 Claim 11**

Bard argues that the Court should construe "use" in these patent claims as meaning "injecting [contents of a syringe] . . . during a catheterization procedure."

Medline argues that no construction is necessary, and the plain meaning of "use" is clear. The relevant portions of the disputed claims are as follows:

> **'088 Claim 1**: "the first syringe and the second syringe are ordered within the tray in accordance with their use during a catheterization procedure"
>
> **'088 Claim 25**: "the first syringe and the second syringe are ordered within the tray in accordance with their use during a catheterization procedure"

5

> **'088 Claim 37**: "the first syringe and the second syringe are ordered within the tray in accordance with their use during a catheterization procedure"
>
> **'761 Claim 1**: "A tray configured to accommodate a Foley catheter, the tray comprising: a surface defining a single layer tray comprising at least two compartments separated by a barrier, the at least two compartments comprising: a first compartment supporting a first syringe and a second syringe at different heights based upon order of use in a Foley catheterization procedure";
>
> **'596 Claim 11**: "The catheterization kit of claim 7, wherein the first syringe and the second syringe are positioned at different elevations within the first compartment, the different elevations being associated with an order of use of the first syringe and the second syringe during a catheterization procedure."

Bard argues that the term "use" requires construction because the customary meaning of use of a syringe is to inject stored contents. Bard supports this conclusion by relying upon a few dictionary definitions of syringe. Bard asserts that the specifications are consistent with this construction of use. They describe syringes containing fluids and specifically describe injecting those stored fluids during the catherization procedure. Medline argues that no construction is necessary. Medline asserts that "use" is not a complicated term and Bard's attempt to import the word "injecting" from dictionary definitions of syringe into the construction of "use" is improper.

Even under Bard's assessment, the term "use" appears to be clear in the context. It is redundant to say that it is for injecting fluids where a POSITA reading the entire patent would understand that to be what "use" means in context. There is no need for construction when even a lay judge can read a term and understand its meaning in context. *See Phillips*, 415 F.3d at 1312–13. Here the meaning of "use" is clear and further construction is unnecessary.

### C. "Mnemonic Device" in '088 Claim 1; '761 Claim 15; and '596 Claim 15

Bard contends that the term "mnemonic device" should be construed as, "A first compartment base member supports the syringes at different heights and locations to provide a cue as to their order of use."

Medline argues that the appropriate construction is, "Feature intended to assist the memory, such as ordering items left to right or top to bottom." During the claims construction hearing, Medline agreed to abandon the second portion of this proposed construction.

The relevant portions of the disputed claims are as follows:

> **'088 Claim 1**: "the first compartment comprising a base member that defines a mnemonic device indicating which of the first syringe or the second syringe should be used first in the catheterization procedure.
>
> **'761 Claim 15**: "the first compartment base member . . . the base member defining a mnemonic device indicating which of the first syringe or the second syringe should be used . . ."
>
> **'596 Claim 15**: "the single level tray defines a mnemonic device indicating that the first syringe should be removed from the first compartment before the second syringe during a catheterization procedure"

Bard argues that according to the claims, the first compartment base member defines the mnemonic device and that the mnemonic device indicates the order of use of the syringes during the catheterization procedure. Bard argues that because the first compartment base member has a stair-stepped contour in one of the embodiments discussed in the specification to the '088 patent, the Court must construe this claim as a mnemonic device based on varying heights. Bard also asserts that in a predecessor patent, the patent examiner specifically noted that prior art did not teach a mnemonic device because the prior art did not have a base chamber with different heights. Medline asserts that Bard's construction is inconsistent with the specification because

7

the specification indicates the mnemonic device in one embodiment is composed of both differing heights and placing the syringes in a left-to-right configuration.

Bard's construction attempts to limit the claim to one embodiment identified in the specification. The claim language makes clear that the claimed mnemonic device is defined by the base member of the first compartment. Bard's construction thus is an attempt to construe the meaning of base member, not mnemonic device itself. Reading the claims in their entirety, it is abundantly clear that the mnemonic device is a feature of the base member that is intended assist the memory, and nothing about the claims require that feature to include a stair-stepped design. Therefore, the Court adopts Medline's proposed construction as modified: "feature intended to assist the memory."

**D. "Lubricating Jelly Application Chamber/Compartment" in '761 Claims 1, 10, 15, 18, 19; '088 Claims 7, 17, 19, 28, 38, 50, 51, 53, 66, 67, 69, 82, 83, 85.**

Bard argues that "Lubricating Jelly Application Chamber/Compartment" should be construed as "the portion of the base member of the first compartment where the lubricating jelly is dispensed is lower than adjacent portions of the base member."

Medline argues that construction is not necessary and, in the alternative, that it should be construed as "a compartment or chamber where lubrication is applied."

The relevant portions of the disputed claims are as follows:

> **'761 Claims 1, 10, 15, 18, 19**: "the first compartment defining a lubricating jelly application chamber" / "lubricating jelly application compartment"
> **'088 Claims 7, 17, 19, 28, 38, 50, 51, 53, 66, 67, 69, 82, 83, 85**: "the first compartment defining a lubricating jelly application chamber" / "lubricating jelly application compartment"

8

Bard argues that the claim requires that the first compartment *define* the lubricating application compartment and that this only occurs when it is "configured with a stair-stepped contour." Bard bases this argument on the fact that the specification states that:

> The stair-stepped contour 215, working in tandem with the first opening 221, gives the tray additional advantages over prior art catheter containers. For instance, when the first compartment 201 has a first compartment base member 207 configured with a stair-stepped contour 215, the first compartment 201 can be used as a lubricant applicator for the catheter.

'088 Patent at 7:36–42. Bard argues that this passage makes it plain that the first compartment can only be used as a lubrication chamber when it has a stair-stepped configuration.

Again, Bard's argument attempts to limit the claim to a preferred embodiment in the specification. The claim language is clear on its face, the first compartment must itself serve as a lubricating jelly chamber or must have some structural component that constitutes the lubricating jelly chamber. That chamber can exist, in the context of these patents, without the first chamber having a stair-step configuration, as the entirety of the first compartment could serve as the lubricating jelly chamber. This is consistent with the specification which states, "when the first compartment 201 is used to apply lubricating jelly to the catheter, the lubricating jelly can be applied while the catheter is contained within the tray 200." '761 Patent at 10:1–4; *see* '088 Patent at 8:9–12. Thus, the Court adopts Medline's proposed construction: "a compartment or chamber where lubrication is applied."

E.     " . . . to lubricate a/the tip . . ." in '596 Claims 9, 14, 21

Bard argues that the term ". . . to lubricate a/the tip . . ." is indefinite under 35 U.S.C. § 112 because it combines apparatus steps with method steps, and it is unclear whether infringement occurs when one creates a system that allow for a user to use the invention or when the user actually uses the invention. Doc. 120 at 22 citing *In re Katz Interactive Call Processing*

9

*Patent Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011). A single claim covering both an apparatus and a method for using that apparatus is indefinite and does not satisfy § 112. *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016).

Medline argues that these claims are not indefinite because the claims are functional and that Bard waived this argument by not raising it during its invalidity contentions.

The relevant portions of the disputed claims are as follows:

**Claim 9**: "wherein the first compartment is configured to receive the lubricating jelly from the second syringe to lubricate a tip of the Foley catheter when the tip is placed into the first compartment."

**Claim 14**: "a tip of the Foley catheter configured to be placed within first compartment to lubricate a tip of the Foley catheter when the lubricating jelly has been dispensed from the second syringe into the first compartment."

**Claim 21**: "the first compartment configured to receive a tip of the Foley catheter and the lubricating jelly from the second syringe to lubricate the tip after the first syringe and the second syringe have been removed from the first compartment"

The functional language "configured to" in each of these claims is a clear indication that the claims refer to the functionality of the configuration of the compartment in the case of claims 9 and 21 and to the configuration of the Foley catheter tip in claim 14. "If an apparatus claim is clearly limited to a[n apparatus] possessing the recited structure and capable of performing the recited functions, then the claim is not invalid as indefinite." *UltimatePointer*, 816 F.3d at 826 (quotation marks omitted) (alteration in original). Each claim begins with the functional language "configured to," which is a common, recognized term for introducing apparatus claims. *See, e.g., Radware Ltd. v. A10 Networks, Inc.*, No. C-13-02024-RMW, 2014 WL 1572644, at *12 (N.D. Cal. Apr. 18, 2014) (finding that term "configured to" does not require user intervention). The claims at issue here are limited to an apparatus with a specific structure that is

10

capable of being lubricated or receiving lubrication. These claims are infringed when the apparatus is created with these features, not when the user actually engages in the lubrication.

Bard argues that even though "configured to" is functional language it does not eliminate the method claims from these claims. Bard asserts that in claim 14 "configured to" is nonsensical because it refers to the tip, not the tray. It is not clear why Bard believes this is nonsensical; a tip must be configured in some manner, and in this claim, it is configured to allow for lubrication within the first compartment. With respect to claims 9 and 21, Bard argues that these claims require a specific order of steps: that the medical practitioner insert the tip into the lubricating chamber after removing the first syringe and second syringe from that chamber. Bard argues that a POSITA could not view a manufactured tray and determine that a tray functions in this manner. This argument also fails; because the claims are clear that the design of the tray is to allow for it to function in the described manner, it is not relevant if it could also function in some other non-infringing manner. A POSITA could certainly view a manufactured tray and determine whether its configuration would allow for the first compartment to receive the tip of the Foley catheter and lubricating jelly after one has removed the first and second syringe from that compartment. Therefore, these claims are not indefinite and do not require construction.

### H. "Catheter Assembly" in '400 Claim 13; '088 Claims 7, 17, 19, 38

Bard argues that Catheter Assembly in the '400 patent should take its plain and ordinary meaning because its meaning is already defined by the claims. Bard does not address the '088 patent at all until its reply brief. In its reply, Bard argues that Medline's entire argument that the '088 patent refers to a Foley catheter is improperly based on the '400 patent.

Medline argues that catheter assembly should be construed as "a medical device that includes a Foley catheter connected via coiled tubing to a drainage receptacle." Medline argues

that catheter assembly does not have a specific meaning and that in light of the entire patent, a POSITA would view it as including a Foley catheter.

The relevant portions of the disputed claims are as follows:

**'400 Claim 13**: "a catheter assembly including a coiled tube coupling an indwelling catheter to a fluid receptacle, the indwelling catheter including an inflatable portion configured to receive the inflation fluid from the first syringe to maintain the indwelling catheter within a patient."

**'088 Claim 7**: "the first compartment defining a lubricating jelly application chamber to lubricate at least a portion of a catheter assembly."

**'088 Claim 17**: "The medical procedure kit of claim 16, the first compartment defining a lubricating jelly application chamber to lubricate at least a portion of a catheter assembly."

**'088 Claim 19**: "The medical procedure kit of claim 18, the printed instructions to instruct application of lubricating jelly to the catheter assembly using the lubricating jelly application chamber."

**'088 Claim 38**: "The medical procedure kit of claim 37, the first compartment defining a lubricating jelly application chamber to lubricate at least a portion of a catheter assembly."

1. *The '400 Patent*

The parties do not dispute that catheter assembly does not have an accepted meaning in the art. However, Medline has clearly acted as its own lexicographer in the '400 patent and defined the term in claim 13 as "including a coiled tube coupling an indwelling catheter to a fluid receptacle, the indwelling catheter including an inflatable portion configured to receive the inflation fluid from the first syringe to maintain the indwelling catheter within a patient." The only differences between this definition and Medline's proposed definition is that this one states it includes an indwelling catheter and Medline argues it should be limited to a Foley catheter,

which is a type of indwelling catheter, and this definition includes a fluid receptacle whereas Medline asserts it should be a drainage receptacle. The main issue then is whether the terms of the claim and specification limit the type of indwelling catheter in such a way that it can only be a Foley catheter in these patents—the parties do not spill much ink on the distinction between fluid and drainage receptacles.

The language of claim 13 is unambiguous, and where the claim language is clear there is no need for further construction unless the claiming party acted as its own lexicographer or disavowed the full meaning of the claimed terms in the specification or patent prosecution. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012). Here, Medline argues that it has disavowed the full scope of the term "indwelling catheter," limiting it to just Foley catheters. The standard for disavowal is "exacting." *Id.* at 1366. "The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.* (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). Simply disclosing only one embodiment in the specification is not enough to disavow all other embodiments. *Id.* at 1368 ("Simply . . . disclosing embodiments that all use the term the same way is not sufficient to redefine a claim term."). The disavowal must be clear. *Id.*

Medline argues that the specification clearly defines indwelling catheters as Foley catheters in the '400 patent and that during the prosecution history, Medline clearly disavowed other types of catheters. The specification states in the relevant part that "[t]he catheter assembly 700 includes an indwelling (or Foley) catheter coupled to a fluid bag 730 by a tube 720." '400 Patent, 8:25–27. This is different than where a party attempts to read limitation from a preferred

13

embodiment in the specification into the claims. Rather, here the structure of this sentence is clear that Medline is using indwelling as a synonym for Foley. This is an example of the patentee acting as its own lexicographer to define claim terms more narrowly than their general definition.

The patent prosecution also demonstrates Medline's intent to limit the meaning of indwelling to Foley catheters. In interview summary notes, the patent examiner stated that after Medline's proposed addition of what is now claim 13 to the patent claims, he did not reach an agreement with Medline that a catheter as described in that claim—namely an indwelling catheter—was disclosed in the original disclosure. *See* Doc. 99-2 at 18. In response, Medline provided two expert declarations. The declaration from Barbara Weintraub stated that a POSITA would understand, based on the specification and drawings, that the trays "are designed to house Foley catheters." Weintraub Decl. ¶ 15. The declaration from Richard Meyst similarly concluded that the specification and drawings disclosed a "Foley catheter, and no other type of catheter." Meyst Decl. ¶ 42. These declarations were instrumental to gaining approval from the patent examiner for the inclusion of claim 13. The examiner accepted the expert declarations as sufficient to show that the indwelling catheter was disclosed in the drawings and specification because it was obvious to anyone in the field that such a catheter was part of the catheter assembly as claimed. The expert declarations at no point indicate that other types of indwelling catheters are disclosed, and in fact the Meyst declaration expressly states that no other type of catheter, indwelling or otherwise, is disclosed by the drawings or specification. Therefore, the prosecution history is clear that in the full context of the patent, indwelling catheter is synonymous with and limited to Foley catheter.

Medline also argued that the Court should accept the Center for Disease Control's ("CDC") statement that indwelling catheters are Foley catheters as dispositive. In his declaration, Dr. Meyst specifically states that the CDC defines indwelling catheters as Foley catheters and excludes other types of catheters, unless a Foley catheter is also present. Meyst Decl. at ¶ 47. This statement, made as part of the prosecution history, is a clear statement that indwelling and Foley catheters are synonymous in the context of this patent, and further demonstrates a disavowal of the full scope of the term indwelling.

Bard argues that the patent prosecution history is simply about disclosure of a Foley catheter, which is different than a disavowal. But the discussion in the prosecution history goes beyond mere disclosure of the Foley catheter. The repeated statements equating indwelling to Foley catheters and statements that no other type of catheter is disclosed in the patent evidence an intent to define indwelling catheter as a Foley catheter. Thus, for the '400 patent, the proper construction of catheter assembly is "a medical device that includes a Foley catheter connected via coiled tubing to a fluid receptacle, the Foley catheter including an inflatable portion configured to receive the inflation fluid from the first syringe to maintain the Foley catheter within a patient."

  2. *The '088 patent*

The '088 patent does not have a definition of catheter assembly in the claim itself like the '400 patent does. Furthermore, the '088 patent does not have a long discussion in its prosecution history discussing the meaning of indwelling catheter. Thus, these two patents, despite addressing similar material, come before the Court in very different positions, and therefore, require separate analyses.

The term catheter assembly is not a term of art. Thus, the Court turns to the intrinsic record to determine, in the context of this patent, what a POSITA would take catheter assembly to mean. Bard points out that in other claims in the '088 patent, Medline specifically claims a Foley catheter. Bard argues that to construe catheter assembly as including a Foley catheter would violate the principle of claim differentiation, which presumes that different words or phrases used in separate claims have different meanings and scopes. *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971–72 (Fed. Cir. 1999). However, Medline is not asking the Court to construe catheter assembly to mean Foley catheter, but rather is asking the Court to construe catheter assembly as including a Foley catheter. Thus, the two phrases still have different meanings and scopes: a catheter assembly is something that includes a Foley catheter among other things, whereas a Foley catheter is simply the catheter itself. Synecdoche is not a principle of claim differentiation; parts do not equal wholes and wholes do not equal parts.

However, Bard correctly notes that all of the uses of the term Foley catheter in the specification occur in examples of embodiments of the claimed invention and do not serve as disavowals of a broader scope or a definition of catheter assembly. *See Enercon GmbH*, 151 F.3d at 1384. The number of times the specification references Foley catheters is certainly an indication that the inventors had Foley catheters in mind as a preferred use of the claimed tray, but it is not sufficient to serve the public notice function of patents. Patents should be written so that the public knows what the patent holder owns and what the holder does not own. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 723, 122 S. Ct. 1831, 152 L. Ed. 2d 944 (2002). By discussing Foley catheters only in the context of sample embodiments,

16

Medline has not put the public on notice that it is only claiming catheter assemblies that include Foley catheters. Thus, limiting the claim to that embodiment is not proper.

Viewing the specification and the rest of the intrinsic record as a whole, the Court concludes that there is no basis to conclude that catheter assembly in the '088 patent is limited in the same way as in the '400 patent. Despite the fact that both patents use the same term, the Court finds that the stark differences in the intrinsic records of the two patents requires a different construction, overcoming the presumption that the same terms carry the same construed meaning in related patents. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). Therefore, the proper construction of catheter assembly in the '088 patent is "a medical device that includes a catheter connected via coiled tubing to a fluid receptacle."

### 3. Related Litigation

The Court notes that the parties have disputed this term in the two other related cases: *Medline Industries Inc., v. C.R. Bard Inc.*, 14 C 3618 ("*Medline I*") and *Medline Industries Inc., v. C.R. Bard Inc.*, 16 C 3518 ("*Medline II*"). The court in *Medline II* adopted the following construction: "a medical device that includes a catheter connected via coiled tubing to a drainage receptacle." *Medline II*, 16 C 3519, Doc. 171 at 16. The patent at issue in *Medline II* did not provide its own definition in the claims of catheter assembly like the '400 patent did here, nor did the prosecution history include a detailed back and forth with the patent reviewer regarding the meaning of indwelling catheter. Indeed, the patent in *Medline II* did not even use the word indwelling. *See* Patent No. 8,746,452. Thus, the *Medline II* court's construction, despite differing from that adopted by the Court here, is entirely consistent with the patents before that

court. The construction of the term in the '088 patent on the other hand is largely consistent with the construction in *Medline II*, the only difference being use of the word fluid in the place of drainage. The Court has adopted fluid for consistency with the construction of the '400 patent.

Similarly, the court in *Medline I* construed "catheter assembly" to mean "A coiled medical device that includes a catheter connected via tubing to a drainage receptacle." *Medline I*, 14 C 3618, Doc. 348 at 25 (Jan. 11, 2019). In reaching this construction, the court noted that there the prosecution history included "no statements to suggest that the catheter in catheter assembly must be a 'Foley' catheter." *Id.* at 6. This is markedly different from the prosecution history of the '400 patent and similar to the history of the '088 patent. As discussed above, this difference is critical and results in differing constructions across these patents.

I.     **"Barrier," "Flange," and "Reveal"**

Medline asserts that the parties have agreed on the following constructions of these terms:

> Barrier: "Structure that separates one compartment from another and prevents or blocks movement between the two."
>
> Flange: "A projecting flat rim, collar, or rib."
>
> Reveal: "To make visible or to make (something that was hidden) able to be seen."

Bard concedes that it agrees with the construction of barrier and reveal, but not with flange. However, during the claims construction hearing, counsel for Bard stated that it would not argue that its syringes do not have flanges. Regardless, there is no doubt that a POSITA would know exactly what a syringe flange is, as it is a common part of nearly all syringes used to brace the syringe against the index and middle finger when using the syringe. Additionally, flange is a common word being used for its common definition in these patents. Thus, no further

18

construction is necessary. Therefore, the Court will adopt the proposed constructions of barrier and reveal and finds that flange does not require construction.

## CONCLUSION

The Court construes the disputed terms as follows:

| Patent No./Claim | Disputed Term | Construction |
|---|---|---|
| '761 Claims 1, 10, 15, 19 | "Patient Aid" | patient instructions configured with an appearance or indicia that ensures information is delivered to a patient undergoing a procedure |
| '088 Claims 1, 25, 37; '761 Claim 1; '596 Claim 11 | "Use" | No construction required |
| '088 Claim 1; '761 Claim 15; '596 Claim 15 | "Mnemonic Device" | feature intended to assist the memory |
| '761 Claims 1, 10, 15, 18, 19; '088 Claims 7, 17, 19, 28, 38, 50, 51, 53, 66, 67, 69, 82, 83, 85 | "Lubricating Jelly Application Chamber/Compartment" | a compartment or chamber where lubrication is applied |
| '596 Claims 9, 14, 21 | "to lubricate a/the tip" | No construction required |
| '400 Claim 13 | "Catheter Assembly" | a medical device that includes a Foley catheter connected via coiled tubing to a fluid receptacle, the Foley catheter including an inflatable portion configured to receive the inflation fluid from the first syringe to maintain the Foley catheter within a patient |
| '088: Claims 7, 17, 19, 38 | "Catheter Assembly" | a medical device that includes a catheter connected via coiled tubing to a fluid receptacle |
| '761 Claims 1, 10, 15, 19; '088 Claims 61, 77; '596 Claims 1, 14, 17; '400 | "Barrier" | structure that separates one compartment from another and prevents or blocks movement between the two |

| | | |
|---|---|---|
| Claims 1, 13, 15, 18 | | |
| '761 Claim 19; '088 Claims 4, 6, 29, 39; '596 Claim 6 | "Flange" | No construction required |
| '596 Claims 3, 10, 21; '400 Claims 12, 17, 22 | "Reveal" | to make visible or to make (something that was hidden) able to be seen |

Dated: January 28, 2019

_____
SARA L. ELLIS
United States District Judge